Baldwin, J.
The nature and extent of the obligation to render military service, is clearly ascertained by the principles of the public law. “ Every member of a society,” says Vattel, “ is obliged to serve and defend the State. Society cannot otherwise be maintained; and this concurrence for thé common defence is one of the principal intentions of every political association. Every man capable of carrying arms, should take them up, at the first order of him who has the power of making war.”—“As every citizen or subject is obliged to serve the State, the Sovereign has a right, in case of necessity, to enlist whom he pleases. But he should choose only such as are proper for the occupation of war; and it is highly proper to take, as far as possible, only volunteers, who enlist cheerfully and without compulsion. No person is naturally exempt from taking up arms in defence of the State; the obligation of every member of society being the same. They only are excepted who are incapable of handling arms, or supporting the fatigues of war. This is the reason why old men, children, and women are exempted.”
*409 Thus we see that the government of a country has a right to call for the military service of its citizens or subjects, who are capable of bearing arms, and to exact obedience; but that in the exercise of this power, it ought, in its discretion, to select, in the first place, for such service, those who are desirous of rendering it. For obvious reasons, the consent of the individual, freely and deliberately given, according to the prescribed formalities, cannot be retracted. The enlistment is usually spoken of as a contract, and without impropriety, inasmuch as that expresses the mutual consent of the parties : but it is a contract of a peculiar nature, placing the parties in a new and important relation towards each other, that of commander and soldier, by which the liberty of the citizen is greatly abridged, and the authority and control of the government greatly enlarged. The compact, in its principles and consequences, is certainly widely different from the ordinary civil compacts between individuals. The latter spring from the relative interests of the parties ; the former from their relative duties. The military compact may be dissolved at any moment by the supreme authority of the government : the civil compact usually requires for its dissolution the mutual consent of the parties, and is sometimes incapable of dissolution by the consent of both. I do not, however, object to the name of contract as applied to a voluntary enlistment: the name is unimportant, unless we suffer it to mislead us as to the true character of the thing.
It seems to me obvious that the enlistment of a minor capable of bearing arms, does not fall within the general rule of the municipal law, in regard to the incapacity of infants under the age of twenty-one years, to bind themselves by contract. Nor am I disposed to regard the enlistment as an exception to that rule. The rule, I think, has no application to the subject. The capacity of all citizens or subjects able to bear arms to *410 bind themselves to do so by voluntary enlistment, is in itself a high rule of the public law, to which the artificial and arbitrary rule of the municipal law forms no exception. The rule of the public law is subject to but two conditions, the ability of the party to carry arms, and his consent to do so; and these conditions may exist in as full force at the age of eighteen as at the age of twenty-one, The party is subject to no incapacity by any arbitrary rule in regard to discretion; and there is but little room for discretion when he is in the line of his allegiance and public duty.
The whole difficulty in the subject, as I conceive, arises from the failure to discriminate between the public of national law and the municipal or domestic law. The former is inherent in, and essential to the powers of sovereignty, and regulates the intercourse of the nation, whether pacific or hostile, with other nations. It commands the whole public force, and directs it to the defence, the protection, the honour, and the advancement of the State. These important powers may be concentrated in a single arm, or distributed amongst various departments of a government, (as in a limited monarchy, or a confederated republic with a national head;) and it is the wise distribution of them, and not the exemption of the citizen therefrom, which distinguishes free from despotic institutions.
The common or unwritten law does not alter the public or national law, biit recognizes it, and is in subservience to it. It in no wise affects the public law, unless in the distribution of the powers thereof, where there is no written, organic or constitutional law. It cannot repeal or overrule the public law; for there can be no prescription against the inherent and essential powers of the State. At what period in the history of the common law did the Judges undertake to determine what subjects were not bound to follow the King to his wars; or what property should be exempt from the 3e- *411 vies of Parliament for the defence of the Realm ? These are not matters for their decision, except as the mere expounders of the sovereign will. The abuse of impressment for the navy, so contrary to the genius of the English laws, and utterly condemned by ours, serves to shew the sacrifices to which a free and gallant people may submit for the defence and glory of the State. Even the written law itself, whether statutory or organic, cannot wholly extirpate, though it may administer, distribute, or modify the powers of sovereignty ; for any essential portion thereof undelegated, would still remain in the body of the nation. Let us suppose, if we can, that a written constitution were to prohibit the government from defending the country, against an invading foe, could any one doubt that the people or the several States of a confederated republic would still retain the power themselves.
The common law of England has never interfered with the free and voluntary enlistment of minors capable of bearing arms; and could not have done so without usurpation. There is not, so far as I have observed, the slightest trace of any decision, or any dictum, or any opinion of any Englishman, to countenance the idea. The total absence of all attempt of the sort is in itself negative authority of a decisive character; for how has it happened that amongst the thousands of minors enlisted into the British armies, during the lapse of centuries, not a single effort has been made on the part of the minor himself, or his parent, or guardian, to rescue him from the service on the ground of infancy? The answer is, because no one supposed it possible. If the contrary idea had been entertained, hundreds of cases would have occurred, and the books would be full of decisions upon the very point. And this suggests the reason why the English books are so barren upon the subject. No one supposing that the common law could overrule the pertinent principle of the public law, what *412 ever has been said that bears upon the question is indirect or incidental. All that we find, however, is against the alleged exemption.
There are principles of the common law sufficiently comprehensive to embrace the case, and which must, therefore, be considered as impliedly recognizing the appropriate principles of the public law. Thus, we are told that an infant may do things necessary to he done for the public good; and that he may do a thing to which he is bound or compellable by law to do. 3 Com. Dig. Enfant, B. 6. And this, in reference to military service, must be understood of the general duty to render it, and of the general power of the government to exact it; and not merely of the special requisitions of any particular law.
In The King v. The Inhabitants of Roach, 6 T. R. 247, 252, 254, a case of Walpole St. Peter's v. Wisbeach St. Peter's, upon a question of pauper settlement, was stated and commented upon, and the principle of the decision appears to have been, that an enlisted minor was emancipated, during his military engagement, from all parental control, by the new relation which he contracted with the government.
In The King v. The Inhabitants of Rotherfield Greys, 8 Eng. C. L. R. 95, which was also a case of settlement, it was held that though a minor, by enlisting in the marines, became subject to the control of the Crown, and .continued subject to that control as long as the period of his service continued; yet the term of his enlistment having expired before he attained the age of twenty-one years, the relation between him and the Crown ceased; and having returned to his father’s family, he again became subject to the parental control. And Best, J. said: “ By the general policy of the law of England, the parent’s authority continues until the child attains the age of twenty-one years; but the same policy also requires that a minor shall be at liberty to *413 contract an engagement to serve the State. When such ... . . . an engagement is contracted, it becomes inconsistent with the duty which he owes to the public, that the parental authority should continue. The parental authority, however, is suspended, but not destroyed. When the reason for its suspension ceases, the parental authority returns.”
The English statute book itself furnishes abundant evidence of what the Legislature considered the true principle on this subject, recognized by the common law. The Acts of Parliament in relation to the army, not only do not contain any provisions for the relief of minors from their contracts of enlistment, but are full of special enactments wholly incompatible with the idea of their common law exemption. Thus, the masters of apprentices bound for considerable periods of time, are not only protected against the enlistment of them, without the consent of the master, by severe penalties upon the recruiting officer and the recruit, but the apprentice is held to military service after the expiration of his apprenticeship; or upon the master’s consenting to give up the indentures, the latter is entitled to receive a large portion of the bounty. So militiamen, without reference to age, are, by like provisions, prevented from enlisting in the army. And hasty enlistments are guarded against by special enactments, applicable indiscriminately to adults and minors; such as an examination before a justice of the peace, and a right of retraction within four days from the time of enlistment. 3 Burns’ Justice 335, 7, 8, tit. Military Law; 2 Eng. Stat, at Large, p. 679, 680, 681.
Thus it will be seen that in England, neither the common law nor the statute law protects minors from the effect of their contracts of enlistment; and no one has ever supposed that parents or guardians have the right to reclaim them from military service.
*414 In .our country, the Constitution of the United States ^as expressly vested in Congress the power “ to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; to raise and supPort arm^es > í0 Provide and maintain a navy ; to make rules for the government and regulation of the land and naval forces; to provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions; to provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress.”
It is clear that by these grants of the Constitution, Congress possesses substantially, in some form or shape, all the most important war-making powers which the public law gives to a national sovereignty. We have seen that the Sovereign may enlist whom he pleases, but that he may in his .discretion prefer the service of volunteers. Hence it has been inferred by some, that when he enlists volunteers, he not only waives the right of compulsion, but places the matter upon the mere footing of civil contract, to be governed exclusively by the rules of the common law applicable to ordinary contracts between individuals. To this opinion I cannot subscribe. We must not lose sight of the character and relation of the parties, their pre-existing rights and duties, and the nature of the engagement. When he resorts to consent instead of compulsion, he waives the compulsion and nothing more. He reserves the right to take the consent of all those against whom he might, if he had chosen, employ compulsion. ' He has a right to contract with all capable of rendering the service. As to discretion, the ability and the duty to bear arms imply sufficient discretion ; and he is not obliged to resort to the artificial and *415 arbitrary rule of the municipal law in relation to the age of discretion for making civil contracts. It is a matter of substance and not of form; and a man has as much dicretion at the age of twenty years, eleven months and twenty-five days, as he has at the full age of twenty-one.
The opinion which 1 had the honour to deliver, with the concurrence of the Court, in the United States v. Cottingham, 1 Rob. R. 615, seems, in part, to have been much misunderstood by some. That opinion does not assert the enlistment of a recruit to be no contract. On the contrary, it is expressly admitted to bo a contract; but it is stated to be something more, and not to be subject exclusively to the principles affecting the validity of contracts. Points of difference between the contract of enlistment and ordinary civil contracts, are mentioned; and it is not contrasted with, but in some measure assimilated to the contract between master and servant. The want of reciprocal obligation, in one respect, to wit, the term of service, is not specified, as distinguishing it from all contracts, but from most contracts: and so is the right of the government to compel obedience by a resort to physical force. In the latter respect, it is in effect likened to, instead of contrasted with, the contract of apprenticeship. The general remark is, however, made, that important traits of the engagement arise, not so much from the specific terms of the contract, as from the relation in which it places the parties towards each other. And this is surely true in regard to other relations arising out of contract; such, for example, as the relation of husband and wife, created by the contract of marriage ; in which, by the way, the ago of capacity, and not of discretion, prevails in the common law. The nature of the engagement is moreover illustrated by appointments to civil and military office, all of which create relations arising out of compact, to wit, the tender of the appointment on the one hand, and the acceptance of it on the other.
*416 The question still recurs whether a minor capable of bearing arms may bind himself by his consent, or what is the same thing, his contract to do so. And why may he not? Why may not a man of eighteen do this as we^ as a man tw'enty_one ? What is there alarming in this? Is it because of his being emancipated for the time, from parental authority, and placed under the authority of the State? Or because of the greater pain which it may give to his parents and friends that he should engage in military service at the former, than at the latter age ? Or because of the privations and hardships and perils, to which he is thus sooner exposed? The parental authority is given, not for the advantage of the father, but for the advantage of the infant, and of the State. And who shall say that it is not for the benefit of the minor, and of,the State, that he shall step forward in time of need, to defend the rights, the interests and the honour of the State ? The calamities of war, it is true, are great, but they will not be diminished by lessening the public force. And if grief and want may follow the taking of the child from his parents, is the evil greater than when the father is taken from his children and his wife ?
It is clear, if a minor, capable of bearing arms may bind himself to do so, that his father, master or guardian, has no authority to reclaim him. And it is agreed on all hands that the Constitution of the United States has conferred upon Congress the power to authorize the enlistment of persons of any age. So, the whole question is, at last, whether by the Act of Congress of May 1846, providing for the prosecution of the war with Mexico, the authority given to engage the service of volunteers is confined to men above the age of twenty-one years. And a grave question it is, for, if determined in the negative, the many minors now or hereafter engaged in the service, may abandon it at the most momentous crisis.
*417 When we look into the Act of Congress, we find it an authority to the President to employ the militia, naval and military forces of the United States; and to call for and accept the services of any number of volunteers not exceeding 50,000, who may offer their services, either as cavalry, artillery, infantry or riflemen, to serve twelve months after they shall have arrived at the place of rendezvous, or to the end of the war, according to the time for which they shall have been mustered into the service ; to be accepted in companies, battalions, squadrons and regiments; the officers of which are to be appointed in the manner prescribed by law in the several States and Territories to which such companies, battalions, squadrons and regiments shall respectively belong.
The act, it will be seen, gives a general authority to the President to accept the service of volunteers. It of course contemplates men capable of bearing arms, but not a word is prescribéd in regard to size, age, nativity or other qualification. The reasons are sufficiently obvious. The force was to be raised for a temporary and sudden emergency. A war had burst upon us, and no preparation had been made for it. The exigency required that the strength of the country should be promptly put forth. Our gallant little army was in peril. Our territory was subject to invasion. The honour of our country was at stake. It was no time for weighing the conveniences and comforts of domestic and civil life with grains and scruples. The object was to obtain men capable of rendering military service. A reinforcement by recruiting was too slow. The militia service was inadequate, and an appeal was made to the patriotism of the people. The call was for volunteers, in masses, from the body of the militia, to be organized by the State authorities, and inspected and mustered into the service of the United States. Every presumption was in favour of the ability to carry arms of volunteers thus brought forth and embodied; and nothing *418 more was contemplated. If such ability in reference to this statute was still to be a subject for judicial decision, instead of official discretion, then it must be determined, not by the special circumstances of each particular case, but by a general rule of uniform application. We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms; and that it is the military age recognized by the whole legislation of Congress, and of the State of Virginia, and of all the States of the Union, perhaps without exception. There was no temptation and scarcely any room for abuses in the execution of the law; and cases of fraud, and want of consent from mental aberration or debility, are exceptions from every rule, and applicable to every, age.
It seems to me, therefore, free from difficulty, that the Act of Congress of May 1846, is in conformity with the public law and the constitutional powers of Congress; and that it contemplated the military, not the civil age of consent to obligatory'engagements. I think it clear, moreover, that there is nothing in the Municipal Code of Virginia, whether common law, or statutory, which conflicts with this legislation of the national government : but if this were otherwise, the result would be the same. “ The Constitution and the laws of the United States made in pursuance thereof, are the supreme law of the land; and the Judges in every State are bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding.” The Act of Congress is general and sweeping in its provisions, without recognizing any exception of persons between the ages of eighteen and twenty-one ,• much less requiring the consent of parents, masters or guardians. Surely it cannot be true that Congress, in its legislation’, ■must be construed to speak in deference to the municipal laws of the several States; or is bound to summon any of those laws into its statute for the invidious pur *419 pose of condemning them by an express veto. Nor can I conceive by what process of reasoning any part of the act in question can be treated as a disabling or restrain-u mg Statute.
If any exemption can be brought to bear upon the case before us, it must be found, not in the act of May 1846, but in some other statute; and accordingly the act of March 1802, fixing the military peace establishment of the United States, repealed as to recruiting in part by the act of December 1814, for filling the ranks of the army of the United States, but restored, perhaps, in that respect, by the 7th section of the act of March 1815, again fixing the military peace establishment, has been invoked on the part of the petitioners. But what bearing has the proviso relied on, of the act of 1802, upon the present subject ? It is an act in regard to the permanent standing army of the United States. The 11th section of it provides, “that the commissioned officers who shall be employed in the recruiting service, to keep up, by voluntary enlistment, the corps of the military peace establishment, (consisting of three regiments,) shall be entitled to receive for every effective able bodied citizen of the United States who shall be enlisted by him for the term of five years, and mustered, of at least five feet six inches high, and between the ages of eighteen and thirty-five years, the sum of two dollars: provided nevertheless, that this regulation, so far as it respects the height and age of the recruit, shall not extend to musicians, or to those soldiers who may re-enlist into the service: and provided also, that •no person under the age of twenty-one years shall be enlisted by any officer, or held in the service of the United States, without the consent of his parent, guardian, or master, first had and obtained, if any he have ; and if any officer shall enlist any person contrary to the true intent and meaning of this act, for every such of-fence, he shall forfeit and pay the amount of the bounty *420 and clothing, which the person so recruited, may have received from the public, to be deducted out of the pay and emoluments of such officer.”
What application can this statute for keeping up the stanc^ng army in time of peace, by directions to recruiting officers, in regard to individual enlistments, with bounties for success, and penalties for disobedience, have to an emergency like that provided for by the act of 1846, calling for 50,000 volunteers, if found necessary, to be received by companies, battalions and regiments, from the mass of the militia? What officers of the army were to recruit the volunteers; who to enjoy the bounties; who to be liable to the penalties; who to take and record the consent of parents, masters and guardians? Does any one suppose that these volunteers, when wounded or disabled in the service, would be entitled to the pensions allowed to soldiers of the regular army, but for the express provision by the 7th section of the act of 1846 ? Can the tender and acceptance of a regiment of volunteers under the act of 1846, be considered an enlistment by a recruiting officer of the standing army, under the act of 1802 ?
But it is urged that the proviso of the act of 1802, not only prohibits the recruiting officer from enlisting a minor without the consent of his parent, «fee. but prevents the recruit from being held in the service of the United States; and hence it is inferred, that the latter prohibition embraces all minors, whether regulars or volunteers, and whether recruited under the act of 1802, or brought into the service of the United States under any other law. If this be so, it gives an unexampled potency to a proviso; which is never construed to enlarge an enacting clause. Edwards v. Carpenter, 1 Hen. & Munf. 340. Here, under the enacting clause, the recruiting officer has a general authority to enlist able bodied citizens of a specified height and age; with a proviso requiring in regard to minors, the consent of pa *421 rents, masters, or guardians, if any. Is it not obvious that there is no exception of minors from the general authority to enlist; and that their enlistment is only subject to a condition, to wit, the consent of the parent, &c. if any, and if none, why then, that there is no condition at all ? How is it possible to treat this condition not only as an enactment of this particular law, but of all other laws upon similar, or even dissimilar subjects ? And where shall we stop short of an exclusion from the service of the United States, in regard to all military, or even all civil engagements? Why not apply the words “ or held in the service of the United States," to the navy, or even the militia, as well as a corps of volunteers ? Is it not manifest that these words are applicable only to the special subject of the particular law, and mean nothing more than this, that the recruiting officer is not only prohibited from enlisting the persons conditionally privileged, but that they shall not be held bound to the service of the United States under the prohibited enlistment ?
It is further urged, that the Act of Congress of December 1814, for filling the ranks of the army, throws light upon this subject: and so it does, but in a way very different, as I concieve, from that supposed on the part of the appellees. It serves to shew that the legislative policy of Congress in time of peace, in regard to the enlistment of minors, is not uniformly the same in time of war: but, on the contrary, that at periods of great emergency, the qualified protection is withdrawn, even in respect to the standing army, and other alterations made relative to the qualifications of recruits. By the act just mentioned, recruiting officers are authorized to enlist into the army any free, effective, able bodied man, (instead of citizen,) between the ages of eighteen and fifty, (instead of thirty-five or forty-five,) the enlistment to be abolute and binding upon all persons under the age of twenty-one years, as well as *422 upon persons of full age. Thus, the qualified exemption of a minor, under the act of 1802, and under a subsequent act of January 1813, supplementary to the act for the more perfect organization of the army, was removed ; and his enlistment made absolutely obligatory. And this has been argued as indicating the sense of Congress that minors were exempted from enlistment by the common law, and could only be bound by an enabling statute. If this were so, it would only serve to shew that. Congress was then mistaken upon that point. But to my mind, it does not tend to shew any such impression on the part of Congress. The object was to rescind the qualified exemption under the previous acts. This object, it is said, might have been attained by simply repealing the proviso of the act of 1802, and that of the act of 1813. This is true, if there had been no other purpose. But a privilege was still allowed to a minor, not extended to an adult; that of reconsidering his enlistment and withdrawing his consent within four days; which privilege is, by the British statutes, given indiscriminately to all recruits, whether adults or minors. And another provision, affecting some minors, was also borrowed from the British statutes, to wit, some indemnity to the masters of apprentices, by allowing them a portion of the bounty. Besides, the general authority to enlist, the exemption, and its limitation, were somewhat interwoven in the previous acts; and in a matter of some complexity, it was probably thought better to express directly the then legislative will upon the whole subject, instead of leaving it to construction; and, at most, nothing more could be deduced from the language employed, than some redundancy of legislation : a misfortune which sometimes happens.
The American authorities, as far as they go, tend to sustain the foregoing views of the subject.
The Commonwealth v. Murray, 4 Binn. R. 487, decided in 1812, was the case of a youth between seven *423 teen and eighteen years of age, engaged to serve in the navy, under the Act of Congress of January 1809, authorizing the President of the United States to cause to be engaged and employed 3600 able seamen, ordinary seamen and boys, to serve for a period not exceeding two years. The infant had no father, master, or guardian, and was living with his mother, who did not consent to the contract; but who was considered as having no legal authority over him. It was held that he was bound by his engagement. It was unnecessary to go beyond the ground that, under the circumstances, the contract was obligatory by the Act of Congress; and the case was so treated by the majority of the Court, upon the concession, for the argument’s sake, (and for the argument’s sake only,) that by the common law an infant may avoid any contract by which he has bound himself to any service: Tilghman, Ch. J. remarking, that the proviso in regard to minors, in the act of 1802, concerning the army, being omitted in the act respecting the navy, a question might be made, whether infants may not engage themselves in the navy even without the consent of parents, masters and guardians: a question which was not decided.
The question substantially thus waived, was after-wards, in 1824, directly presented to, and decided by the same Court, in The Commonwealth v. Gamble, 11 Serg. Raw. 93; which was the case of the enlistment of a minor into the marine corps. The opinion of the Court was delivered by Gibson, Ch. J., who, after shewing that the provision in the Act of Congress on the subject of recruiting the army had no application, said, that it was unnecessary to enquire whether the case fell within the act which authorizes the enlistment of minors as seamen, as he was well satisfied the enlistment was good independently of the enabling provisions of any statute. That at the common law the contract of an infant will bind him where it is beneficial; and he *424 was far from being convinced that the contract of enlistment is not in contemplation of law of that kind; but that he put the case on broader ground, the ground of public policy, which requires that a minor be at liberty to enter into a contract to serve the State, whenever such contract is not positively forbidden by the State itself ; during which service, parental authority over him is suspended, though not annihilated. This, he said, is the common law of England; and there is nothing in the constitution of the government, or of the circumstances of the people of this country, to afford a reason why it should not be the common law here. That in a state of war, the necessity of such a principle is obvious; and the same necessity exists, though in a less degree, in time of peace.
Mere boys, unable to render service in the army, are employed in the navy, because their service is important and necessary in that arm of the national force: and it was held by Judge Story, in the case of the United States v. Bainbridge, 1 Mason’s R. 71, that under the Acts of Congress for the employment of men and boys in .the navy, the contracts of enlistment of the latter are obligatory upon them, though made without the consent of parent, master or guardian. And he shews that the disabilities of an infant are intended by law for his own protection, and not for the protection of the rights of third persons; and that the validity of the infant’s act or contract is, in point of law, independent of the right of custody in his parent.
Such is the current of the American reported cases. There are some early, and perhaps recent, Massachusetts decisions which look the other way; the principle of which is condemned by Judge Story, in the case of the United States v. Bainbridge, ub. sup. 86.
In my view of this subject, I have thought it useless to moot the question, whether the Act of Congress of May 1846, in directing the officers of the volunteer *425 force to be appointed by the State authorities, conforms to the Constitution of the United States: the validity of a volunteer’s engagement to serve, cannot turn upon that question. And I deem it unimportant whether the volunteers are to be regarded as United, States troops, or State troops, in the service of the United States, or militia. Militiamen, called for by draft, may step from the ranks as volunteers, and may surely dispense with a draft; or consent to extend the term of their service; or agree not to stop short of a geographical line ; or to serve under any officers however selected. The limits between a militia, or State, or United States service, are to my apprehension, too narrow for distinguishing the obligation of the voluntary engagement. The military age is all-sufficient in regard to all. A man of eighteen is old enough to die for his country, and not too young to render her effectual service.
I think the sentence of the circuit Judge ought to be reversed, and the volunteer remanded to the service.
Allen, J.
It becomes important to a proper understanding of the questions arising on this application, to enquire whether a voluntary enlistment into the military service of the United Stales is to be treated as a contract between parties competent to contract, or as an appointment by the government to an inferior grade of military service. The latter view of the relation between the government and the soldier, was taken by Judge Baldwin, in a portion of the opinion delivered in the case of the United States v. Cottingham, 1 Rob. E. 615. I concurred in that opinion at the time it was delivered. Being perfectly satisfied then, and still, that the conclusion arrived at was correct in regard to the enlistment of an alien, I did not investigate all the grounds taken by our learned brother in support of his conclusions. I considered so much of the Act of Congress of March 1802, under which the question arose, as related *426 to the personal qualities of the recruit, his size, his age, (supposing him to be competent to enter into such an engagement,) and his citizenship, as directions to the recruiting officer, inserted for the benefit of the government 5 allc^ which it might therefore waive: that although the recruiting officer might incur a forfeiture for disregarding the directions, this did not avoid a contract into which the recruit, having the capacity to assent to it, had voluntarily entered. This view was sufficient for the decision of that case. But I am not prepared to assent to the proposition that a voluntary enlistment is not a contract; and to be governed by the ordinary principles of law regulating the validity of contracts. The want of a reciprocal obligation in regard to the subject matter of the contract, does not change the nature of it. The recruit is bound to serve his term, but the government may discharge him at any moment, it is said! The same may be said of contracts of hiring. The employer of an overseer engages him for a term at stipulated wages; but as circumstances may render it inexpedient to continue him, the employer may and very frequently does reserve the power to discharge him within the term. The reservation of such a power does not relieve the overseer from his obligation to serve out the term if not discharged. The 'government may compel specific performance by the exercise of physical force. So may the master of an apprentice, but this does not abrogate the contract as evidenced by the indentures of apprenticeship. The government has the right to call the inhabitants capable of bearing arms into its military service without regard to their assent. This is true, and as it seems to me this principle of the public law has led to what I conceive is an erroneous view of this subject of voluntary enlistment. The power to enforce service from all capable of bearing arms, is one thing. When it is exercised, all idea of consent or contract is excluded. It is command on one side, uncon *427 ditional obedience on the other. But that principle has no application to the case of voluntary enlistments. The government foregoes the exercise of her extreme power; the exigencies of the country have not, we may suppose, required a resort to it. No command is issued to all embraced within a certain class to enter into the service. But when terms are addressed to the individual, his consent must be had to them; and therefore his capacity, as well as his right to assent or dissent, is presupposed by the very terms offered to him. In truth, the case of the United States v. Cottingham presents a striking illustration of the proposition, that voluntary enlistment must be regarded as a mere contract, the validity of which is to be determined by principles applicable to all other contracts, in the absence of any special legislation on the subject. It was held in that case that the enlistment of an alien was valid. And the obligatory force of the enlistment did not result from any temporary allegiance the alien might owe to the country in which he was sojourning, or the obligation resting on every citizen to serve and defend the State, so far as he was capable. No such considerations could apply to him. He was bound by his enlistment, upon the ground of contract, and that alone. In the case of the United States v. Wyngall, 5 Hill’s R. 16, the Supreme Court of New York, in determining that an enlistment of an alien is valid, treat the enlistment as a contract, a bargain, an engagement to serve.
But it is supposed that even if voluntary enlistment is to be treated as a mere contract, yet as the Sovereign has a right to require the service of every citizen capable of bearing arms, this right to require such service, invests every citizen capable of bearing arms, with the capacity to make binding contracts for military service. This, it strikes me, is a startling doctrine to be deduced from the jus publicum. Because service in case of public necessity may be enforced from all capable of render *428 ing it, without regard to age, each, in his individual character is endowed with the capacity to enter into a voluntary contract to serve ! Physical ability would alone be regarded, and each individual case would be determined, not with reference to any common standard of age. The J . . personal qualities of the recruit would ascertain his capacity to contract. Under the Constitution, Congress can provide and maintain navies as well as raise and support armies. It is important to the efficiency of that great arm of national defence, that sailors should be trained from an early age. Boys of tender years may render service on board the ship; and for the purpose of raising up an efficient body of skilful sailors, enured to the perils of the sea, the Act of Congress of January 1809, authorized the enlistment of 3500 men and boys. But is that act, or any general law, authorizing the recruiting of sailors for the navy, to be so construed as to abrogate the parental control over the child of ten or twelve years of age? And because an infant, not arrived at years of discretion in any sense of the word, may be physically capable of performing public service in the navy, must we adjudge him to be capable of entering into a binding contract to render the service, against the consent of his natural guardian ? The relation between parent and child, is, of all others, the most important. The whole superstructure of civil society rests upon it. Under our law, there can be no interference with it, except in cases of gross neglect. Enough is conceded, when it is admitted, the government may, in the exercise of its authority, disregard it. When the public exigencies require it to do so, guards will be provided against abuse. But until there is an express declaration of an intention to change the rule in reference to military contracts, they must be controlled and regulated by the principles applicable to other contracts. We must look to the common law as existing amongst ourselves, modified and adapted to our peculiar *429 institutions, to ascertain whether the party entering into a contract of this kind, possesses the legal capacity to bind himself by such an engagement. No direct authority has been cited to us from the English reporters; and, upon this question, I should not consider them as entitled to much consideration. The power of declaring war, and of directing all its operations, belongs to the King. His authority to call out the array of the kingdom, as feudal head of the nation, may have empowered him to demand service from all, of any age, capable of rendering it. With or without a statute to justify it, his press-gangs could seize the individual and hurry him on board the armed vessel. A power exercised under these kingly prerogatives can have no place in our system. Congress alone can declare war; and must provide by law the means and men for carrying it on. And if Congress docs not abrogate the municipal law, where the contract of enlistment is entered into, we must look to that law in determining upon the capacity of the party to contract.
As a general rule, the contracts of infants under the age of twenty-one are void, or voidable at the election of the infant. But to this general rule, there are several exceptions. Infants, with the assent of their parent or guardian, may bind themselves to serve as apprentices to learn some useful trade or calling. It has not been pretended that enlistment falls within this exception.
Infants may bind themselves for necessaries. The infant is bound, not so much on the ground of the contract, but only because the infant must live, and the law gives a reasonable price to those who furnish him with the means of doing so. Story on Contracts, § 56. Hence the claim must be for necessaries, or on the direct contract for them; and a negotiable note, and a penal bond, although given by the infant for necessaries, may be avoided. 2 Kent’s Com. 235. And whilst the infant *430 remains under the control of his parent or guardian, and is supported by him, he is not liable even for necessaries. Story on Contracts, § 57. The contract for enlistment is not a direct contract for necessaries; and we must presume, in the absence of any fact to the contrary, that the infant, being under the control, was supported by his father. The enlistment here does not fall within that exception.
He may do acts for his benefit, which are binding. The principle of this exception is applied most generally to the acquisition of property; and the act must be clearly for his benefit. Where the contract is of an uncertain nature as to benefit or prejudice, it is voidable at the election of the infant. If there was any doubt in determining that such a contract was not clearly to the benefit of the infant, it could not be contended it was not of so uncertain a nature as to be voidable at the election of the infant; and here he unites in the application. Oases are cited in which contracts of apprenticeship have been sustained on this ground, and where the parent had emancipated the son, or did not support him. I think the decision of the case of the U. S. v. Bainbridge, 1 Mason’s R. 71, can be vindicated for this reason: and on this ground, the district Judge rested his opinion. But there is but little analogy between a contract of apprenticeship to learn a useful trade, or acquire skill in a useful calling, and a contract of enlistment to perform mere military service: and we cannot say, from the facts certified, that the infant was emancipated, or not supported by the father.
He may do acts for the public safety. This principle has no application to his contracts.
3 Comyn’s Digest 546, shews the application of it : he may do homage, be sworn as a witness, present to a church to prevent a lapse.
He may do voluntarily what he is legally bound to do. And, therefore, if he be tenant in common, he may *431 make a reasonable partition; (2 Kent’s Com. 242;) or discharge a mortgage on due payment of the debt. Zouch v. Parsons, 3 Burr. R. 1794.
This applies to obligations resting on the individual; but can have no bearing where the duty to serve the country under particular circumstances is common to all. The infant is not compelled by law to enlist; and I have already attempted to shew that the authority possessed by the government to enforce his service, does not affect his capacity to contract.
If these views are correct, it follows, that whatever may be the power of government to enforce military service, or to change the municipal law in regard to the capacity of infants to make binding contracts for military service, until that power is exercised, and the capacity bestowed, the rules of the common law, as existing among us, must control. And this would seem to be the understanding of Congress, to be inferred from all the laws passed on this subject. The act of March .16, 1802, for fixing the military peace establishment of the United States, (the law now in force,) authorizes the enlistment of persons between the ages of eighteen and thirty-five. If it had stopped there, the capacity to contract would have resulted from the authority to enlist, and the contract of the infant over eighteen years would have bound him; though made without the consent of his parent, guardian, or master. I view this not as a statute restricting the public right, but as an enabling statute, changing the rule as to the capacity of the infant to contract in this mode. The act of January 27, 1813, <§. 5, contains a similar provision. The understanding of Congress that some legislation was necessary to render such contracts binding on the infant is more clearly evinced by the act of December 10, 1814, passed at a period when the necessities of the country compelled her to exert all her energies to repel au invading foe.
*432 The first section of this act authorized the enlistment of persons between the ages of eighteen and fifty years ; and provided that the enlistment should be binding on persons under the age of twenty-one, as well as upon Persons °f full aSe‘ ^ the infant, by the public law, had the capacity to bind himself by such a contract, as it is now asserted he had, this provision was unnecessary. But this act being in pari materia¡ passed flagrante bello, and when the country was invaded on nearly all its borders, is worthy of further observation as indicating the sense of Congress on this subject. It not only made such contracts binding on the infant, but expressly repealed the provision in the previous act requiring the consent of the parent in writing. This, too, according to the argument now advanced, was all supererogatory. Congress, though legislating under the pressure of a great public necessity, and more likely to transcend than fall short of their powers, did not, it seems, understand the full extent of the authority belonging to them by the public law. Conscious of the abuse which might grow out of the power conferred by statute, the infant recruit was allowed four days after his enlistment to retract; and provision was made for the indemnity of the master of any apprentice who enlisted. But the law thus guarded was repealed when the necessity which called for and justified this extreme measure ceased. The old act of 1802, reaffirming the control of the natural guardian, was re-enacted; and with that law in force, and no other, so far as this subject is involved, it is now maintained that independent of all statutory enactments, the powers of the general government and its lowest agent engaged in the recruiting service, exceed those granted by the act of 1814: that infants of any age, capable of bearing arms, may enlist without the consent of the parent; and no day is given the rash boy to counsel with his friends, or reflect on the consequences of his act. The rights of masters to the services of *433 their apprentice must be disregarded; for all who are capable of bearing arms are alike subject to this paramount public right: and the master is to lose all that he has expended in bringing up and teaching his apprentice; looking to the period when, by the skill thus ac-i, ... quired, he may be able to get indemnity. A principle leading to such results, violates the sanctity of the domestic hearth ; outrages the plainest maxims of justice ; and receives no countenance from the legislation of Congress ; but is utterly condemned by it.
I have insisted that the engagement to enlist is a contract, to be controlled by the principles regulating other contracts; and by the common law, in force when this engagement was entered into, the contracts of infants are not binding, unless they fall within some one or all of the exceptions which have been allowed to the general rule. And I have tried to shew, that a contract of enlistment, entered into by an infant, under the control of, and supported by his parent or guardian, without the consent of the parent or guardian, is not embraced by the principle of any one of the exceptions.
It then remains to consider what effect the legislation of Congress or this State has upon the capacity of infants to make binding engagements, of the kind entered into by this petitioner.
The only Act of Congress now in force regulating enlistments into the regular army, is the act of March 1802. The 11th section authorizes the enlistment of infants of eighteen years of age, but with this proviso: “That no person under the age of twenty-one years shall be enlisted by any officer, or held in the service of the United States, without the consent of his parent, guardian or master, first had and obtained, if any he have.” The facts certified in this case shew there was no such consent of the father.
The act of May 13, 1846, after reciting that by the act of Mexico, a state of war exists between that go *434 vernment and the United States, to enable the goverument of the United States to prosecute &c., authorized the president to employ the militia, naval and military forces of the United States ; “ and to call for and acceP£ the services of any number of volunteers, not' exceeding fifty thousand, who may offer their services either as cavalry, &c., to serve twelve months, or to the end of the war, unless sooner discharged, according to the time for which they shall have been mustered into the service.” The 3d section provides, that the volunteers shall furnish their own clothes; if cavalry, their own horses and equipments, and be armed at the expense of the United States. The 4th subjects them, when called into actual service, to the rules and articles of war, and places them in all respects, except as to clothing and pay, on the same footing with similar corps of the United States army.
The 5th section provides, that the volunteers so offering their services, shall be accepted by the President in companies, battalions, squadrons and regiments, whose officers shall be appointed in the manner prescribed by law in the several States and Territories', to which such companies, &c., respectively belong.
If it were not for the provision in the 5th section, as to the appointment of officers, these volunteers would be to all intents and purposes, part of the army of the United States; as much so as if recruited in the ordinary mode. There being nothing in the Constitution which designates or prescribes the mode of filling the army of the United States, it may be done either by volunteering or recruiting; and such organization may be given to the force so raised as Congress deems proper. Accordingly, we find that by the 3d and 4th sections of the act authorizing the President to accept the services of State troops and volunteers, passed January 27,1815, the President was authorized to receive into the service of the United States, any volunteers who might offer *435 their services, and to commission the officers of the said volunteers. The volunteer force authorized by the act of 1846, seems to be somewhat anomalous in its character. If a portion of the militia, which may be called forth to execute the laws of the Union, suppress insurrections, and repel invasions, the laws of the State must be looked to as furnishing the rule as to the qualifications and capacity of the persons enrolled in the militia. If, however, the force is to be viewed, as it seems to have been by some, as part of the army of the United States, raised through the agency of the State governments, and existing under a peculiar organization, then the act of March 1802 must govern; for the act of May 1846, is silent as to the personal qualifications of the volunteer. The only law in force which relates to this subject is the act of 1802, which is general in its operation, and applies as well to those who may thereafter enter into the military service of the United States, as to those who were in its service at the time it was enacted. That act declares that the infant shall not be held in the service of the United States, without the consent of the parent, &c., first had and obtained, if any he have. Volunteering is a voluntary engagement, a mode of enlistment. Consent must be given by one possessing the capacity of binding himself by such consent. The law of 1846 in its terms does not change or affect the legal age of giving this consent, or making a binding contract: and if any intention existed to give this capacity to infants, it should have been declared in terms, as it was by the act of 1814; or the act should have contained provisions from which such intent in the mind of the Legislature could have been fairly inferred.
But I incline to the opinion, that this corps is to be treated as part of the militia of the State. The volunteers were not to be received only into the service of the United States, as was provided by the 3d section of the act of January 27, 1815. The President, by the act of *436 May 1846, is authorized to call for and accept the services of the volunteers. Which implies that they were to be called under the provision of the Constitution authorizing Congress to provide for the calling forth of the ni^^a cases specified. And accordingly, we are furnished with a copy of the requisition made by the war department on the Governor, for this regiment. Congress may provide for the calling forth and government of the militia, while in the employment of the United States; but the appointment of the officers is reserved to the States. And, accordingly, the 5th section of the act of 1846, provides that the officers of these volunteers should be appointed in the manner prescribed by law in the several States and Territories. The 2nd section, 2nd article of the Constitution, provides that the President shall nominate, and by and with the advice of the senate, shall appoint all officers of the United States, whose appointments are not therein otherwise provided for, and which shall be established by law ; but Congress may by law vest the appointment of such inferior officers as they think proper in the President alone, the Courts of Law, or in the heads of departments. No authority is conferred to vest the appointment of these or any officers in the State authorities. The officers of this corps are in office, not under the General, but the State government; and their whole authority to command, and enforce the articles of war, is derived from their commissions issued: by the Governor of Virginia. This seems to be the construction put upon the Act of Congress of May 1846, by the Virginia Legislature, by the act of December 9, 1846, providing for the pay and subsistence of the Virginia regiment of volunteers called into the service of the United States, under a requisition of the President of the United States of the 16th November 1846 ; and the act passed December 19, 1846, providing for the appointment and commissioning of the field and company officers of the Vir *437 ginia regiment of volunteers called into the service of the United States.
Is there any act of the Virginia Legislature which imparts to the infant this capacity of making binding military contracts, without and against the consent of his parent or guardian. It is argued that this has been done by the act for the better organization of the militia, passed March 8th, 1834, the 32d section of which directs that the commandants of companies shall enrol every able bodied white male citizen between the ages of eighteen and forty-five. By the 46th and 51st sections, volunteer troops of cavalry and companies of artillery, light infantry and rifles, are authorized to be raised out of the line of the militia, by voluntary enlistment within the bounds of the regiment to which they belong: the enlistment to be for the term of three years. The 49th and 61st sections provide, that whenever these volunteers are ordered into service they shall be called out by troops and companies, unless a smaller number may be deemed necessary to perform the duty. The act contains numerous provisions for the regulation of the militia, for the mode of drafting into active service, and for enforcing service according as it may be required in times of peace or war. This law is an instance of the exercise of that authority which belongs to the government to demand military service from all capable of bearing arms. The consent of the individual is not waited for. The government throughout speaks in the voice of command. Obedience is enforced by penalties and physical force. The rights of parents, the interests and authority of masters over their children and apprentices, respectively, are set aside. The only choice left to the individual is the option left him to unite with one of the volunteer troops or companies authorized to be enlisted in each regiment, if the opportunity offers. But these companies are still a part of the militia, subject to all their obligations, liable to *438 be called out in those cases only where the militia may be ordered into active service; and when so called, they are to enter the service, not individually, each for himself, according to the terms of any individual engagement, but in companies, as a portion of the militia, having no right to exercise an individual will on the occasion. It would be a strained construction to hold that the State; in the exercise of her sovereign power-over this subject, intended in any degree, to enlarge or affect the capacity of individuals to enter into contracts or engagements for military service. It may be, that the State could by law provide that when a requisition for militia was made, the quota might be made up by voluntary enlistments from the line; and that any person enrolled might so enlist or volunteer. It is enough for the present to say there is no such law.
No State shall keep troops in time of peace, without the consent of Congress. With that consent the State may keep an army in time of peace, and without it in time of war, and may pass all laws necessary to the due exercise of the power. Might, I presume, fill up the ranks of her army by conscription or by voluntary enlistment;. and prescribe the age at which the contract might be entered into. We are to consider this question with' reference to what is, not what might be. There was no law in force authorizing any individual, though enrolled in the militia, to volunteer into companies’ not constituting a part of the regiments to which they belonged, but to form a distinct, peculiar corps taken from the State at large, and intended for a peculiar service. The acts of December 9th and 19th, providing for the pay and subsistence of the volunteers, and the appointment and commissioning of the officers, recognize it as a corps of Virginia troops; and perhaps may be considered as giving validity to the first enrolment by this subsequent sanction. But they do not purport to change the capacity of individuals to enter into en *439 gagements. The enrolment is confirmed and sanctioned so far only as the party had capacity at the time to make a binding engagement, provided it should be accepted by the government.
I think, therefore, that this act of voluntary enlistment, is a contract to be regulated by the principles applicable to other contracts entered into by an infant.
That when entered into by an infant under the control of, and supported by the parent, guardian or master, and without his consent, it is not binding.
That it is not embraced within any of the exceptions to the general rule as to the void or voidable character of the contracts of infants.
That whatever may be the public right or power of government to command the services of all of every age, capable of bearing arms, that power has not been exercised on this occasion.
That a law authorizing the enlistment or volunteering of troops, and nothing more, is not to be construed as the exercise of this ultimate power; and as changing the municipal law in respect to the capacity of parties to contract.
That such a construction of the act of May 1846, is at war with the whole series of legislation on the part of Congress in relation to this subject.
That so far from changing the capacity, it recognizes the capacity, as ascertained by the municipal law, by requiring the consent of the volunteer, and furnishing no rule by which the capacity to give that consent is to be measured, save that furnished by the municipal law of the place where the engagement is entered into.
That if these volunteers are to be viewed as part of the army of the United States, organized by Slate agency, there is not only no law of Congress which authorizes the enlistment or volunteering of the infant, without the consent of the father, having the control over him; but the act of March 1802, provides that the in *440 fant so enlisted shall not be held in the service of the United States.
And that if this corps is to be regarded as troops of the State, there was no law in force when the requisition was made to authorize the organization of such a corps; and that the subsequent acts recognizing it as part of the troops of Virginia, did not purport to alter the law touching the capacity of infants to bind themselves by their contracts.
I am of opinion the decision of the Judge, discharging the petitioner, was correct and should be affirmed.
Brooke, J.
The power to declare war, which is given to Congress by the Constitution of the United States, in the 8th section of that instrument, I do not think is a sovereign power, according to the definition of sovereign power by the writers on the law of nations. It is a responsible power, which sovereign power is not. According to the theory of the Constitution of the United States, all sovereign power remains with the people.
Ours is not a national government, but a federal government, constituted by the States and the people of the States. The power to declare war, means no more than it expresses. It includes the power to call out the forces of the nation or country as far as the exigencies of war require it. Under the power to declare war, the Congress of the United States passed the act of May 1846, which authorized the President of the United States to call out the militia, or to accept of volunteers not exceeding fifty thousand. In that act, there is no reference to age, as there is in the act of 1802, regulating the enlistment of soldiers in the regular army, and the acts of 1814 and ’15, for the enlistment of men for the navy.
The President, under the act of May 1846, had power to call out the militia, of which the appellee, by the laws *441 of Virginia, was one. But the President preferred volunteers. They were substitutes for the militia, and could be drawn from no other source. The appellee preferred the volunteer service to militia service, in which he might be drafted.
The authority of the parent no longer existed, the moment the appellee was of military age and enrolled in the militia. He then owed higher obligations to his country; and being bound to service in the militia, he was equally bound to serve it as a volunteer. His was not a contract in the nature of a contract at the common law. His enlistment bound none but himself; as the government could discharge him the next hour. All the doctrines of the common law, as to contracts by infants under the age of twenty-one, I think, are entirely out of place in the case before us.
The definition of war given by the elder Adams, (if I recollect aright,) was, “ When the men, women and children of one nation were hostile to the men, women and children of another nation.” As in the times when the whole of one nation marched against another nation, and the contest was ended by one battle.
During the war of the revolution, sixteen was the military age. All of that age were enrolled in the militia, subject to be drafted, or called out en masse; as was the case in our last war with England, in some of the lower counties of Virginia. In the war of the revolution, too, commissions were given to many who were not twenty-one years of age. I myself received a commission as first lieutenant in Col. Harrison’s regiment of artillery, before I was seventeen years of age, whilst I was at school; and served three years, to the end of the war. The military age absolved all from the control of parents, guardians, or masters, as to military engagements and service, as of higher obligations to the country. I concur in the reversal of the judgment.
*442 Cabell, P. concurred with Allen, J.
Daniel, J. concurred with Baldwin, J.
Judgment reversed, and volunteer remanded to service.